IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| B-50.COM, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 3:10-CV-1994-D |
| VS. | § | |
| | § | |
| INFOSYNC SERVICES, LLC, | § | |
| | § | |
| Defendant. | § | |

MEMORANDUM OPINION

In this patent infringement action concerning a method of generating custom reports of restaurant point-of-sale data, the court construes disputed claim limitations of United States Patent No. 6,633,851 ("the '851 patent").

I

Plaintiff B-50.com, LLC ("B-50") holds the '851 patent, which recites "[a] method of generating custom reports based on restaurant point-of-sale data transferred between multiple remote computing devices and a central computing device." D. Br. Ex. 1 at 43. In general, the method contemplates that a user will log on to a website and select a range of point-of-sale data to populate a type of report format that the user customizes. The user will then choose to generate a report and determine how the report is to be communicated to the user. B-50 sues defendant InfoSync Services, LLC ("InfoSync"), alleging contributory patent infringement and active inducement of patent infringement.

The parties dispute the construction of claim limitations in claim 1 of the '851 patent. The court need only construe the disputed claim limitations. *See, e.g., Vivid Tech., Inc. v.*

*Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

## II

The construction of patent claims is a matter reserved exclusively for the court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). The court begins with the words of the claim. *See, e.g., Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1341 (Fed. Cir. 2001). "[T]he words of a claim 'are generally given their ordinary and customary meaning,'" which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313. When "the meaning of a claim term as understood by persons of skill in the art is . . . not immediately apparent . . . the court looks to 'those sources available to the public that show what a person of skill in the art would have understood [the] disputed claim language to mean.'" *Id.* at 1314 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)). "Those sources include 'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'" *Id.* (quoting *Innova/Pure Water*, 381 F.3d at 1116).

"[T]he claims themselves provide substantial guidance as to the meaning of particular

- 2 -

claim terms." *Id.* "The claims, of course, do not stand alone. Rather, they are part of 'a fully integrated written instrument,' consisting principally of a specification that concludes with the claims. For that reason, claims 'must be read in view of the specification, of which they are a part.'" *Id.* at 1315 (citations omitted) (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978, 979 (Fed. Cir. 1995)).

"[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics,* 90 F.3d at 1582). "It is therefore entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims." *Id.* at 1317.

"In addition to consulting the specification, [the] court 'should also consider the patent's prosecution history, if it is in evidence.'" *Id.* (quoting *Markman*, 52 F.3d at 980). "Although [the Federal Circuit has] emphasized the importance of intrinsic evidence in claim construction, [it has] also authorized district courts to rely on extrinsic evidence, which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'" *Id.* (quoting *Markman*, 52 F.3d at 980). "However, while extrinsic evidence 'can shed useful light on the relevant art,' . . . it is 'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Id.* (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)). "[E]xtrinsic evidence in general" is viewed "as less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.* at 1318.

III

The court first construes the disputed terms in the preamble of claim 1 of the '851

patent.

A

The preamble of claim 1 states:

> A method of generating custom reports based on restaurant
> point-of-sale data transferred between multiple remote
> computing devices and a central computing device, the method
> comprising[.]

D. Br. Ex. 1 at 43.  The parties dispute the terms "custom reports" and "central computing

device."

B

B-50 contends that "custom reports" are "the result of executing the 'custom report

format.'"  P. Br. 6.[1]  InfoSync counters that "custom reports" means "static information

generated using the custom report format, which may be directly displayed, printed or

emailed." D. Br. 6.  The parties dispute whether custom reports consist of static information

and whether the construction of "custom reports" should include the ways in which a report

is communicated to a user.

The court agrees with the first half of InfoSync's proposed construction because the

claim language, specification, and drawings demonstrate that "custom reports" consist of

---

[1]In this memorandum opinion, "P. Br." and "D. Br." mean B-50's and InfoSync's
opening claim construction briefs, respectively.  "P. Resp. Br." and "D. Resp. Br." mean B-
50's and InfoSync's responsive claim construction briefs, respectively.

static information.  "Custom reports" consist of static information because the report is generated before it is displayed or otherwise communicated to the user, and because there is no evidence that the contents of a report automatically change or update.[2]  The claim language states that, after the selection operations culminate, a custom report is generated and the restaurant-industry user is able "to view or obtain the *generated* custom report."  D. Br. Ex. 1 at 43 (emphasis added).  The specification and drawings likewise demonstrate that the "custom report" is already generated before it is communicated to the user.  Fig. 3 illustrates the method's process and shows that in one step a custom report is generated and then in the next step the generated custom report is communicated to the user.  *Id.* at 5.  The specification describes that "the custom report is communicated to a human being."  *Id.* at 34.  The method's description of an already-generated custom report's being communicated to a user does not encompass a report with dynamic, continually updating data, such as a web page that automatically refreshes its information.[3]  B-50 does not present any argument to

---

[2]Because the parties do not point to extrinsic evidence, the court considers only intrinsic evidence in construing the term "custom reports."

[3]The specification does not mention the refreshing or updating of information contained in an already-generated report.  It does describe an automatic report-generating process, called a subscription, which is recurring reports that are automatically generated and communicated to the user at a specified frequency. D. Br. Ex. 1 at 36.  But the subscription process creates a new report instead of updating the information in a previously generated and communicated report.  *Id.*

The specification's only descriptions of a website refreshing information relate to updating the list of already-generated reports on the requested reports screen, *id.* at 35, and updating the web page that shows the selections a user made in setting up a report subscription.  *Id.* at 36.

contest that the information in custom reports is static.  The court concludes that "custom reports" consist of static information.

The court declines to construe "custom reports" to include the provision that the reports "may be directly displayed, printed or emailed."  D. Br. 6.  This part of InfoSync's proposed construction is superfluous because the meaning of "custom reports" does not depend on how the generated reports are communicated to the user.  Furthermore, InfoSync's proposed construction fails to list all of the possible ways of communicating a report.  The specification provides a non-exclusive list of communication modes: "The custom report can be communicated by direct display at one of the computing devices, by email to a designated party, otherwise over the Internet, in hard copy, or in the other ways described above."  D. Br. Ex. 1 at 34.  The specification explains that "as technology advances, the invention likely will use other modes of communication and interaction with the Internet, not just those known at present."  *Id*.  The claim language recites only that the user views or obtains the report "using the Internet."  *Id*. at 43.  The court therefore declines to accept InfoSync's proposed description of how custom reports are communicated.

The court construes "custom reports" to mean "static information that is generated using the custom report format."

## C

The court next construes "a central computing device."  B-50 asserts that "a central computing device" means "*a system of servers or higher-end machines* which store, process and/or transmit information to and from multiple remote computing devices."  P. Br. 7

(emphasis added).  InfoSync responds that "central computing device" means "*a single server or higher-end machine* at the top of the hierarchical relationship which stores, processes and transmits information to and from multiple remote computing devices." D. Br. 7 (emphasis added).  The parties' proposed constructions present two issues: (1) whether "a central computing device" means multiple central computing devices or a single central computing device, and (2) whether the central computing device itself can consist of multiple servers or higher-end machines, or only a single server or higher-end machine.[4]

1

The court turns first to a threshold issue.  "Central computing device" is one of four disputed terms in the '851 patent that have already been construed in prior litigation brought by B-50 against an unrelated defendant.  *See* Order Adopting the Special Master's Final Report and Recommendation on Claim Construction, *B-50.com, LLC v. Xformity, Inc.*, No. 04-0542-B (N.D. Tex. Feb. 23, 2006) (Boyle, J.) ("Xformity Order").[5]  InfoSync contends

_____

[4]The parties' constructions also differ regarding whether the central computing device is "at the top of the hierarchical relationship."  Judge Boyle adopted this hierarchy description in her claim construction.  *See B-50.com, LLC v. Xformity, Inc.*, No. 04-0542-B, Order at 6-7 (N.D. Tex. Feb. 23, 2006) (Boyle, J.).  B-50 offers no argument to dispute this part of the construction.  The court deems it unnecessary to describe the "central computing device" as at the top of a hierarchical relationship.  By addressing hierarchy, such a description defines the term "central," which need not be separately defined in construing "a central computing device."  *See infra* § III(C)(3) (construing "a central computing device" as "one system of servers or higher-end machines which stores, processes, and transmits information to and from multiple remote computing devices").

[5]Of the terms disputed in this case, Judge Boyle construed "central computing device," "defining a custom report," "report initiating page," and "the selection operations include."  *See* Xformity Order 10-11.

- 7 -

that issue preclusion should apply and bar B-50 from relitigating the terms already construed in B-50's prior infringement action against Xformity, Inc. ("Xformity").  *See TM Patents, L.P. v. IBM Corp.*, 72 F.Supp.2d 370, 375 (S.D.N.Y. 1999) (applying issue preclusion to claim construction in plaintiff's subsequent lawsuit under same patent).

Issue preclusion requires a final judgment.  *See J.R. Clearwater Inc. v. Ashland Chem. Co.*, 93 F.3d 176, 179 (5th Cir. 1996) ("Finality is an essential component of the concepts of both *res judicata* and collateral estoppel [i.e., issue preclusion].");  *see also Hartley v. Mentor Corp.*, 869 F.2d 1469, 1471 n.1 (Fed. Cir. 1989) (holding that to determine principles of issue preclusion, Federal Circuit looks to law of circuit where appeal would ordinarily lie in non-patent case).  Although finality for preclusion purposes may require a lesser threshold than finality for appellate review under 28 U.S.C. § 1291, *see Lummus Co. v. Commonwealth Oil Refining Co.*, 297 F.2d 80, 89 (2d Cir. 1961), a bare, initial claim construction ruling is not a final judgment fit for issue preclusion.  In *Lummus* Judge Friendly reasoned that finality for preclusion purposes "turns upon such factors as the nature of the decision (i.e., that it was not avowedly tentative), the adequacy of the hearing, and the opportunity for review."  *Id.* The Fifth Circuit has "declined to adopt this more flexible notion of finality," instead refusing to apply issue preclusion where appellate review is unavailable and the district court can revise its ruling at its discretion prior to final judgment.  *See J.R. Clearwater*, 93 F.3d at 179 n.2 (citing *Avondale Shipyards v. Insured Lloyd's*, 786 F.2d 1265, 1270-71 (5th Cir. 1986)).

An initial claim construction ruling like Judge Boyle's lacks the required finality

because a district court can continually revisit and revise its claim constructions throughout the litigation. *See Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1359 (Fed. Cir. 2006) ("[A] district court may engage in claim construction during various phases of litigation, not just in a *Markman* order."). Furthermore, there is scant opportunity to appeal a claim construction ruling until after the ruling is applied to decide the litigants' claims and defenses. The Federal Circuit consistently rejects requests to review bare claim construction rulings. *See Portney v. CIBA Vision Corp.*, 401 Fed. Appx. 526, 529 (Fed. Cir. 2010) (noting that Federal Circuit had only once granted petition to review merits of claim construction ruling under 28 U.S.C. § 1292(b)); *Linear Tech. Corp. v. Impala Linear Corp.*, 31 Fed. Appx. 700, 702-03 (Fed. Cir. 2002) (denying review sought under Fed. R. Civ. P. 54(b) because summary judgment ruling did not address all parties affected by the claim construction order, which would have resulted in premature claim construction review).

Although the court declines to treat Judge Boyle's construction of the '851 patent as preclusive, it will defer to her construction, where appropriate, to further the patent law goal of uniformity. *See Markman*, 517 U.S. at 391 (expressing that benefit of treating claim construction as question of law is promotion of uniformity and "intrajurisdictional certainty through the application of *stare decisis*"); *Tex. Instruments, Inc. v. Linear Techs. Corp.*, 182 F.Supp.2d 580, 589 (E.D. Tex. 2002) (recognizing that deference to another judge's claim construction is ideal where it "would not run afoul of fairness considerations"). Additionally, "the undersigned invariably gives serious and respectful consideration to the decisions of other judges of this court on questions of law—and typically follows them because they are

usually correct and because predictability in such matters is desirable." *SEC v. Cuban*, 798

F.Supp.2d 783, 788 (N.D. Tex. 2011) (Fitzwater, C.J.).

2

Judge Boyle held that "a central computing device" means a single central computing

device, not multiple central computing devices. Xformity Order 10. InfoSync urges the

court to reach the same conclusion in this case. B-50 argues that the indefinite article "a" in

"a central computing device" means "one or more."

Although B-50 correctly states the general rule, the Federal Circuit has explained that

it has "not set a hard and fast rule that 'a' always means one or more than one . . . . When

the claim language and specification indicate that 'a' means one and only one, it is

appropriate to construe it as such even in the context of an open-ended 'comprising' claim."

*Harari v. Lee*, 656 F.3d 1331, 1341 (Fed. Cir. 2011). Here, the context of "a central

computing device" evinces the patentee's clear intent to limit "a" to the singular. *See TiVo,*

*Inc. v. EchoStar Commc'ns Corp.*, 516 F.3d 1290, 1303 (Fed. Cir. 2008) ("[T]he question

whether 'a' or 'an' is treated as singular or plural depends heavily on the context of its use.").

As Judge Boyle explained, the context shows that "a" means "one" because when the

claim language refers to multiple items it consistently uses terms that signify more than one.

*See* Xformity Order 9. For example, the claim language describes "multiple remote

computing devices," "one or more report formats," and "at least one of the remote locations."

D. Br. Ex. 1 at 43. In contrast, the claim language uses "a" to describe singular items in the

method, such as "starting from a report initiating page," or "generating a custom report . . .,

the custom report being based on point-of-sale data." *Id.* "In other words, B-50 knew how to specify multiples when it so chose." Xformity Order 9; *see also* D. Br. Ex. 1 at 43 (as an example, claim 1(b) states "displaying on *a* page *one or more* remote locations." (emphasis added)).

The '851 patent's description of its method also supports construing "a central computing device" as singular. The method includes "transferring point-of-sale data to a central computing device from multiple computing devices at multiple remote locations." D. Br. Ex. 1 at 43 (Claim 1(a)). Claim 2 describes the process of "communicating the custom report format over the Internet from the central computing device." *Id.* Claim 9 provides that the method comprises "storing point-of-sale data for each of the remote locations at a location associated with *the central computing device*." *Id.* at 44 (emphasis added); *see Phillips*, 415 F.3d at 1314 (expressing value of using other claims in patent as source of enlightenment for meaning of claim term). The ordinary meaning of the claim language describes data coming from multiple locations to one central device, being stored in that device, and then being communicated from that device.

B-50 responds that the specification describes the possibility of multiple central computing devices. The specification states that "although only one central computing device is illustrated, embodiments of the invention contemplate *multiple central computing devices* if needed or desired for a particular application or environment." D. Br. Ex. 1 at 33 (emphasis added). Although this portion of the specification does not support construing "a central computing device" as a single central computing device, the court agrees with Judge

- 11 -

Boyle that the specification's language is not determinative. *See* Xformity Order 8. "A court may not use the specification to reset the clearly defined boundaries of the different claims." *RF Del., Inc., v. Pac. Keystone Techs., Inc.*, 326 F.3d 1255, 1264 (Fed. Cir. 2003). Here, properly construed, the claim language limits "a central computing device" to a single central computing device, which the specification cannot contradict. *See id.* (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998)) ("Although one may look to the written description to define a disputed term . . . 'the resulting claim interpretation must, in the end, accord with the words chosen by the patentee to stake out the boundary of the claimed property.'").

3

The parties also dispute whether "a central computing device" is a single server or higher-end machine, or a system of servers or higher-end machines. The court construes "a central computing device" as one system of servers or higher-end machines.

A single central computing device is not necessarily limited to one server or machine, and the claim language contemplates that the central computing device could consist of more than one processor and storage device. Claim 18, a dependent claim, recites, "The method of claim 1, wherein transferring point-of-sale data to a central computing device includes transferring point-of-sale data to *at least* one processor and *at least* one storage device." D. Br. Ex. 1 at 44 (emphasis added). Because independent claims are broader than dependent claims, "a central computing device" in claim 1 is presumed to include and exceed the scope of claim 18's description. *See Bradford Co. v. Conteyor N. Am., Inc.*, 603 F.3d 1262, 1271

(Fed. Cir. 2010) (explaining that independent claim's scope is presumed to be broader than that of dependent claim); *see also Am. Med. Sys., Inc. v. Biolitec, Inc.*, 618 F.3d 1354, 1360 (Fed. Cir. 2010) (holding that dependent claim's recitation of wavelengths between 200 nm and 650 nm meant that independent claims were not confined to that range).  Therefore, "a central computing device" in claim 1 can include multiple servers or higher-end machines. InfoSync's proposed construction, allowing for only "a single server or higher-end machine," is unduly narrow.

The court construes "a central computing device" to mean "one system of servers or higher-end machines which stores, processes, and transmits information to and from multiple remote computing devices."

## IV

The court next construes the disputed limitations in the first paragraph of claim 1(b).

## A

Claim 1(b) recites:

> (b) a restaurant-industry user logging into a web site for the purpose of defining a custom report format using an Internet-browser interface, wherein such defining is initiated with web-based report generating selection operations starting from a report initiating page and concluding with a report request selection, wherein the selection operations include[.]

D. Br. Ex. 1 at 43.  The parties dispute the following limitations: "defining a custom report format," "custom report format," "web-based report generating selection operations," "report initiating page," "report request selection," and "the selection operations include[.]"  P. Br.

9-14; D. Br. 9-15, 17-18, and 20.

B

Regarding "web-based report generating selection operations," the parties dispute whether to construe it as a whole or in parts.[6] The court construes the phrase as a whole because, in context, it essentially means selection operations that occur on the Internet for the purpose of generating a report. "Web-based" in this context means an operation that occurs on the Internet rather than on the user's computer offline. The parties agree on two constructions of "selection operations": "clicking or selecting something" and "entering data into 'operative data-entry fields.'" *See* Jan. 27, 2012 Joint Claim Construction Statement 3 ("Jt. Cl. Constr. Statement"). "Report generating" means that the selection operations generate a report. The phrase as a whole serves as an introduction before the claim language recites the selection operations. Therefore, the court construes "web-based report generating selection operations" to mean "selection operations that occur on the Internet to generate a report."[7]

_____

[6]InfoSync contends that "web-based report" has a separate, unrelated meaning from "generating selection operations." InfoSync posits that "web-based report" is describing the type of completed report that displays if the user chooses delivery of the report through the Internet. Such a construction is misplaced considering the context, because claim 1(b) recites the selection operations process, whereas the steps of generating the report and communicating it to the user are described in parts (c) and (d).

[7]The term "selection operations" is construed as the parties agree in the Joint Claim Construction Statement. *See* Jt. Cl. Constr. Statement 3.

- 14 -

C

Claim 1(b) recites that the "web-based report generating selection operations" start from "a report initiating page." D. Br. Ex. 1 at 43. B-50 asserts that "report initiating page" means "any screen where a user can 'define a custom report format.'" P. Br. 12. InfoSync disputes that the term means "any screen," and instead proposes Judge Boyle's construction: "a starting page for defining a custom report."[8] D. Br. 17-18.

Viewing a "report initiating page" in context, the claim language recites "selection operations starting from a report initiating page and concluding with a report request selection." D. Br. Ex. 1 at 43. Because selection operations start from a report initiating page, the court agrees with Judge Boyle's construction that "report initiating page" means "a starting page," not "any screen."

The court construes "report initiating page" to mean "a starting page for defining a custom report format."

D

Although InfoSync proposes a construction of "report request selection," the court concludes that it is unnecessary to construe this limitation. InfoSync's proposed construction—"clicking a button that requests the generation of a custom report," D. Br. 19—adds nothing material to the term's ordinary meaning. B-50 maintains that no construction is necessary. The court is not obligated to construe a claim term that has an

---

[8]Judge Boyle adopted the construction proposed by the special master. *See* Xformity Order 10-11 (adopting special master recommendation).

- 15 -

ordinary meaning when there is no dispute over the scope of the term. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360-61 (Fed. Cir. 2008) (requiring claim construction of term with ordinary meaning because of dispute over term's scope); *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 244 F.3d 1365, 1380 (Fed. Cir. 2001) (holding that district court did not err in declining to construe claim terms that had ordinary meanings given "heavy presumption" in favor of ordinary meaning).

E

The court next construes "the selection operations include." This phrase introduces claim 1(b)'s list of selection operations that a user implements to define a report format. As claim 1(b) recites, the user specifies at least one type of report format, one or more remote locations, and one or more dates or date ranges. *See* D. Br. Ex. 1 at 43. InfoSync contends that the court should construe "the selection operations include" to mean that claim 1(b)'s method requires all three of the listed selection operations, instead of allowing just one or two. B-50 does not respond directly to this position; it contends that the court need not construe this phrase because the parties already agree on the construction of "selection operations."[9]

Judge Boyle construed the phrase "the selection operations include" to mean that the method requires all of the specified selection operations. *See* Xformity Order 10-11 (adopting Xformity special master recommendation). The court agrees. Claim 1(b)'s list of

---

[9]B-50's argument overlooks the importance of "include" in the phrase "the selection operations include."

selection operations is introduced with the phrase "the selection operations *include*."  The Federal Circuit "has consistently interpreted 'including' [to mean] that the listed elements (i.e., method steps) are essential but other elements may be added."  *Lucent Techs., Inc. v. Gateway, Inc.*, 525 F.3d 1200, 1214 (Fed. Cir. 2008) (citing *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1344-45 (Fed. Cir. 2003)).  Therefore, the court construes "the selection operations include" to mean the method of claim 1(b) requires all of the claimed selection operations specified in claim 1(b).

F

Regarding "defining a custom report format," B-50 asserts that this phrase means "a process by which a user performs the 'selection operations' preparatory to generating a 'custom report.'"  P. Br. 9.  InfoSync maintains that Judge Boyle's more detailed construction is proper: "the process in which the restaurant industry user specifies each of the report format, remote location, and date or date range options based on what is displayed for the restaurant industry user in the claimed selection operations."[10]  D. Br. 9-10; *see* Xformity Order 10-11 (adopting special master recommendation).

B-50's construction is overly generic and InfoSync's is unnecessarily descriptive.  Because "defining a custom report format" is a description of a step in claim 1's method, its construction should serve as a clear guide to reading claim 1, but it need not repeat what the

---

[10]Judge Boyle's construction includes the following statement at the end: "as a result of which the restaurant-industry user may then generate a custom report."  Xformity Order 10-11 (adopting special master recommendation).

claim plainly recites.  The court construes "defining a custom report format" to mean "the process in which the restaurant-industry user performs each selection operation specified in claim 1(b)."

## G

The parties also dispute the construction of "custom report format."  B-50 seeks a generic construction: "that which is defined through performing 'selection operations.'"  P. Br. 9.  InfoSync proposes a detailed construction, as it did with "defining a custom report format," that lists each selection operation.  D. Br. 11.  Consistent with the court's construction of "defining a custom report format," it construes "custom report format" to mean "a report format defined by a restaurant-industry user through performing each selection operation specified in claim 1(b)."

## V

The court next addresses InfoSync's proposed constructions for terms in claim 1(b)'s first indented paragraph.  InfoSync proposes constructions for a number of terms that B-50 contends should not be construed because they do not need any definition apart from their ordinary and customary meaning.  The court agrees with B-50 that the following terms need not be construed: "report formats"; "accesses"; "selected portion"; and "defined in one or more queries used to populate the at least one report format."  *See Mentor H/S*, 244 F.3d at 1380 (affirming decision not to construe terms that had ordinary meanings).

VI

The parties dispute the meaning of "can be" in claim 1(b)'s second indented paragraph.

The relevant claim language states: "the selection operations include: . . . displaying on a page one or more remote locations associated with the restaurant-industry user according to one or more user permissions that *can be* assigned by an administrator on a user-by-user basis."  D. Br. Ex. 1 at 43 (emphasis added).  Although the parties focus their dispute on the meaning of "can be," the fundamental disagreement is whether the method *requires* an administrator to assign user permissions.  InfoSync contends that "can be" means "optional or not required," which would mean that it is optional for the administrator to assign user permissions.  B-50 responds that "can be" does not mean "optional," but instead means that the administrator "has the power or ability" to assign user permissions, which supports B-50's position that user permissions are required.

The court reads the claim language to mean that the method requires the assignment of user permissions and these permissions may be assigned on a user-by-user basis.  For example, in the selection operation where the user specifies certain remote locations for the report, the web page only displays the "remote locations associated with the restaurant-industry user according to one or more user permissions."  D. Br. Ex. 1 at 43.  The specification states that "[g]eneral users will have different permissions than administrators" and that a user's access will be limited depending on the user's position in the company.  *Id.* at 34.  This intrinsic evidence shows that user permissions are necessary to define which

remote locations a particular user can select for a report.  Without an assigned user permission, a user would be unable to use the system because no remote locations would be displayed for selection.  The method requires the assignment of user permissions; this step is not optional, as InfoSync contends.

Assigning user permissions is mandatory, but the mode of assigning them is optional. The claim language refers to "user permissions that can be assigned by an administrator on a user-by-user basis." *Id.* at 43.  The specification further explains: "Administrators have the right to make changes to how the system is configured, the power to create user profiles and passwords[.]" *Id.* at 34.  The patent's intrinsic evidence demonstrates that administrators have the power to assign user permissions on a user-by-user basis, but the claim does not state that "user permissions *must be* assigned on a user-by-user basis."  This portion of the claim limitation is optional.

The court construes "can be" and the surrounding claim language to mean that the method's mandatory user permissions may be assigned at an administrator's option on a user-by-user basis.

VII

In claim 1(b)'s third indented paragraph, the parties dispute three terms: "displaying," "operative data-entry fields," and "substantially only those required to obtain."  The court declines to construe "displaying" or "substantially only those required to obtain" because each has an ordinary meaning that renders further explanation unnecessary. *See Mentor H/S*, 244 F.3d at 1380; *Eolas Techs., Inc. v. Adobe Sys., Inc.*, 810 F.Supp.2d 795, 805 (E.D. Tex.

- 20 -

2011) (declining to construe term that had clear meaning that would be readily understandable to jury).

Regarding "operative data-entry fields," InfoSync first contends that the proper term to be construed is "data-entry fields." D. Br. 23. But the claim language supports construing the phrase "operative data-entry fields" as a whole. The relevant claim language states:

> displaying on a page one or more *operative data-entry fields* configured to process a selection operation . . . that specifies one or more dates or date ranges, wherein the *operative data-entry fields* are substantially only those required to obtain the dates or date ranges[.]

D. Br. Ex. 1 at 43 (emphasis added). Because the claim language repeats the entire phrase "operative data-entry fields," the context implies that the patentee considered the phrase a unified term and did not intend to separate "operative" from "data-entry fields."

The parties propose similar constructions of "operative data-entry fields." InfoSync asserts that it means "places on a screen where the restaurant-industry user may enter data for a selection operation." D. Br. 23. B-50 proposes a more detailed construction: "places on a screen where a 'restaurant-industry user' may enter data values for the specific report type, including data values used to specify a date or date range." P. Br. 15. The additional detail in B-50's construction is superfluous because the context of "operative data-entry fields" already demonstrates that these fields are intended for entering data that specify dates. *See* D. Br. Ex. 1 at 43 (claim 1(b), which recites "operative data-entry fields configured to process a selection operation . . . that specifies one or more dates or date ranges"). Therefore, the court construes "operative data-entry fields" to mean "places on a screen where the

restaurant-industry user may enter data for a selection operation."[11]

VIII

In claim 1(d) the parties dispute the construction of three terms: "enabling," "to view or obtain," and "the generated custom report."   Claim 1(d) states: "enabling the restaurant-industry user to view or obtain the generated custom report using the Internet."

The court deems it unnecessary to construe "enabling" or "the generated custom report."  InfoSync proposes constructions for both: "enabling" means "to give power to do something," and "the generated custom report" means "the custom report that has been generated by the preceding steps."  D. Br. 26, 29.  B-50 maintains that neither term needs to be construed.  The court concludes that, in context, the terms "enabling" and "the generated custom report" have their ordinary meaning.

InfoSync seeks a construction of "to view or obtain" to clarify that it means "to either view or obtain, but not both."  D. Br. 27.  B-50 does not dispute this construction, but instead contends that the phrase is self-explanatory and needs no construction.  The court concludes that the phrase "to view or obtain" should be construed and that it means "to either view or obtain, but not both."  *See Kustom Signals, Inc. v. Applied Concepts, Inc.*, 264 F.3d 1326, 1330-31 (Fed. Cir. 2001) (agreeing with district court construction that "or" meant "'a choice

---

[11]Of course, the balance of the paragraph limits the types of data to be entered.

between either one of two alternatives, but not both'").

    October 15, 2012.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE